## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **C.W., A MINOR, BY AND THROUGH HIS GUARDIANS AND NEXT FRIENDS,** | : | **Case No. 1:17-CV-465** |
| | : | |
| | : | **Judge** |
| **JOHN WOOD,** | : | _____ |
| | : | |
| **and** | : | |
| | : | |
| **CATHERINE WOOD** | : | |
| | : | |
| | : | |
| **PLAINTIFFS,** | : | |
| | : | |
| **- VS -** | : | |
| | : | **COMPLAINT FOR COMPENSATORY** |
| **BOARD OF EDUCATION OF THE SYCAMORE COMMUNITY SCHOOL DISTRICT** | : | **MONETARY DAMAGES, PUNITIVE DAMAGES, AND PRELIMINARY AND PERMANENT INJUNCTION** |
| | : | |
| **FRANK FORSTHOEFEL** | : | |
| | : | |
| **DAMON DAVIS** | : | |
| | : | **[JURY DEMAND]** |
| **THE CITY OF MONTGOMERY, OHIO** | : | |
| | : | |
| **SERGEANT GREGORY HARRIS** | : | |
| | : | |
| **JOSEPH T. DETERS in his official capacity as the Prosecuting Attorney for Hamilton County, Ohio** | : | |
| | : | |
| **and** | : | |
| | : | |
| **MIKE DEWINE, in his official capacity as Ohio Attorney General** | : | |
| | : | |
| | : | |
| **DEFENDANTS.** | : | |
| | : | |

## PRELIMINARY STATEMENT

1.      This case challenges unlawful and injurious governmental intrusion into the life of C.W., a 13 year-old child.

2.      On the morning of September 30, 2016, then-12-year-old C.W. received the maximum punitive discipline and treatment possible while at school for social media posts that did not violate the school code of conduct, let alone a criminal statute.  C.W. was suspended for ten days and recommended for expulsion.  He was arrested, handcuffed, publicly humiliated in front of peers and others, and taken to the police department where he was released to his parents and provided a summons to appear in the City of Montgomery Mayor's Court for "unofficial juvenile court."  Now, more than two-hundred and seventy-five days later, the Prosecuting Attorney for Hamilton County, Ohio continues to prosecute C.W. in juvenile court with ever-changing legal theories.

3.      C.W.'s alleged violation and crime was to post two comments totaling 13 words on the Instagram social media platform on the evening of September 29, 2016.  C.W. made these non-curricular social media posts using his own phone, using his own Instagram account, from within his home, and after school hours.

4.      C.W.'s social media posts were directed at the so-called and non-existent "scary clowns" and posted on the "clown.clann" Instagram page. The anonymous creators of that specific Instagram account, which today has over 23,000 followers, claimed that the so-called "scary clowns" would be visiting communities throughout the country.

5.      The fake "scary clowns" made national news in September, 2016.  At the near-peak of media coverage, local television stations openly acknowledged their concern in covering

the "clown craze" for fear of perpetuating a hoax and causing needless concern, yet the media continued to do so.

6.    This "clown craze" prompted thousands of social media users across the country to engage via multiple platforms (e.g., Twitter, Facebook, Instagram) including visiting and leaving comments on the aforementioned clown.clann Instagram page. Some commenters cheered on the individuals who maintained the "scary clown" accounts and perpetuated the hoax, while many others mocked these anonymous individuals and called attention to their crude hoax.

7.    In particular, hundreds of social media comments on Instagram and Twitter resembled the "Come to [an implied location]" format (e.g., "Come to Dallas") with no additional words or context, simply parroting the comments of hundreds of others from across the country observed on the screen.  Some comments were far more specific including specific locations, events, and/or times.

8.    On the evening of September 29, 2016, after learning of the Clown.Clann Instagram page from his classmates, C.W. visited the page, and viewed pictures and comments posted by the anonymous owner of the account as well as other Instagram users who had visited the page and replied the owner's posts. C.W. then posted the following two comments: "DUMB FUCKS COME TO SYCAMORE YOU WONT" and "I'll square up to these [clowns]."[1]

9.    C.W.'s posts were visible for approximately two hours before he deleted them.

10.    Yet, these two posts had tragic consequences for C.W. The following day, the Sycamore Community School District and City of Montgomery Police Department coordinated the child's unlawful discipline, removed him from his class in the middle of the school day while taking a test, deprived him of basic rights, and subjected him to a handcuffed arrest during school

---

[1] The second post as written reads: "I'll square up to these stupid coons." C.W. intended to type "clowns" but mistyped the word and his phone autocorrected the mistyped word to be "coons."

in full view of his peers and others. Nine months later, the Hamilton County Prosecutor continues to unjustifiably and unlawfully prosecute the child with ever-changing legal theories and by using demonstrably false information attested to under oath by the arresting officer. In addition, the Prosecutor seeks to hold C.W. criminally responsible under an Ohio statute that on its face runs afoul of the First Amendment.

11.     The Defendants knew that C.W.'s 13 words were not directed at any fellow student or school official or any particular individual. They knew the "creepy clown" topic was a "hoax" and admitted "[a]t no point was a direct threat made." They admitted that nobody was ever in danger. They knew C.W. did not intend to alarm or cause emotional distress to any particular person. They knew C.W.'s expression was non-curricular. The Defendants knew that C.W. had no criminal record or prior school disciplinary record. Even though the Defendants knew C.W.'s short-lived social media comment did not cause any material and substantial disruption to the operations of the school district they unlawfully violated C.W.'s constitutional rights and caused the media to report that C.W. was arrested for "making clown-related threats" and used a "clown persona." The Defendants purposely ignored, and worse, purposely obscured the otherwise-unambiguous truth of C.W.'s 13 words, choosing instead to over-generalize and harshly use C.W. that morning to intimidate other students.

12.     In the United States, students have individual rights that cannot be irrationally trampled by government officials. 12-year olds have the right to free speech, the right to be free from unreasonable seizures, excessive force, unlawful arrests, and other rights.

13.     The Sycamore Community School District and the City of Montgomery Police Department, and their employees and officials, unlawfully deprived C.W. of these rights, and the Hamilton County Prosecutor unlawfully perpetuates this deprivation.

14. The First Amendment is sacred to our country and the government generally has no power to restrict expression because of its message, its ideas, its subject matter, or its content. C.W.'s speech did not occur in school or at a school-sponsored event, was not a threat directed at students or school officials, and had already been terminated long before he was unlawfully detained, handcuffed and arrested at school.

15. Adding to his accruing injuries, the ongoing unconstitutional prosecution by government officials against C.W., a minor child, continues in bad faith with harassing and illegitimate motives. There is no reasonable expectation that the Defendants will obtain a valid conviction for C.W.'s two posts from his home to an anonymous social media site.

16. The combination of the Defendants' impermissible motive, multiple prosecutorial machinations, improbability of success, and ongoing traumatic injury to a child necessitate that this Court enjoin the ongoing state court criminal proceeding against C.W.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over this matter under 28 U.S.C. § 1331 because of the federal claims involved including those arising under the United States Constitution and 42 U.S.C. § 1983. The Court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

18. Venue is proper in this court pursuant to 28 U.S.C. § 1391(b), as the Plaintiffs reside within this District, the Defendants transact business within this District, and the conduct complained of occurred within this District.

## PARTIES

19.     C.W. is a minor child who, at all relevant times herein, resided in Hamilton County, State of Ohio, and attended Sycamore Junior High School ("SJHS").

20.     John and Catherine Wood are C.W.'s father and mother.  During all relevant periods of time herein, they resided in Hamilton County, State of Ohio.

21.     The Board of Education of the Sycamore Community School District (the "Board" or the "District") is an entity operating under the laws of the State of Ohio and is authorized to sue and be sued as an entity for its acts and those of its agents and employees.  The District has its primary place of business in Hamilton County, Ohio.  At all relevant times herein, the District had authority over how C.W. was treated while he attended SJHS.  The Board of Education was kept fully apprised by the superintendent and ratified the Defendants' unlawful conduct against C.W.

22.     During the relevant periods of time herein, Frank Forsthoefel was the superintendent of the Sycamore Community School District and its final policymaker for the unlawful actions taken against the Plaintiffs.  Forsthoefel ratified all of the Defendants' unlawful conduct against C.W.

23.     During the relevant periods of time herein, Damon Davis was one of two assistant principals of SJHS and, in such capacity, was responsible for the training and supervision of the staff at SJHS and the disciplining of 7th grade students at SJHS.

24.     The City of Montgomery is a municipal corporation in the State of Ohio.

25.     Sergeant Gregory Harris is employed as a police officer with the Montgomery City Police Department. During the relevant periods of time herein, Sgt. Harris was responsible for the investigation, arrest, and filing of charges against C.W.

26.     Joseph T. Deters is the Prosecuting Attorney for Hamilton County, Ohio, elected pursuant to Revise Code § 309.01, and empowered and authorized, pursuant to Revised Code § 309.08(A) to investigate and to prosecute all crimes within that County in the name of the State. Deters is sued in his official capacity for the purposes of obtaining equitable relief.

27.     Michael DeWine is the Attorney General of Ohio, and is, pursuant to Revised Code § 109.02 the chief law enforcement officer of the State of Ohio, empowered to prosecute persons indicted of any crime upon the request of the governor, and otherwise charged with representing the state in civil and criminal matters. DeWine is sued in his official capacity for the purposes of obtaining equitable relief.

28.     All actions and omissions herein by all Defendants were done under the color of state law.

## FACTS

29.     C.W. is a minor child.

30.     In the fall of 2016, C.W. was twelve (12) years old and enrolled as a 7th grade student at SJHS.

31.     In September of 2016, there were a number of social media websites maintained by anonymous individuals that featured so-called "scary" or "creepy" clowns to perpetuate a hoax that the clowns would be visiting communities throughout the United States.

32.     The "scary clowns" were a topic of conversation in the media and amongst SJHS students, including C.W.

33.     On the evening of September 29, 2016, C.W. viewed the "Clown.Clann" Instagram page.

34. C.W. viewed the Instagram page on his own phone, after school hours, and in his home using his own Instagram user account.

35. The Instagram page contained thousands of comments from people all over the world.

36. After viewing some of the comments on the Instagram page made by the so-called "scary clowns" and various others responding to those posts, C.W. posted two comments:

(i) "DUMB FUCKS COME TO SYCAMORE YOU WONT"

(ii) "I'll square up to these stupid [clowns]"[2]

37. The posts were made under one of the several pictures posted on the "Clown.Clann" Instagram page, and thus were only visible to individuals who specifically "followed" C.W. on Instagram or who specifically visited the Clown.Clann Instagram page, clicked on the photo on which C.W. left his comments, and scanned through hundreds of other comments left under that photo.

38. The posts were not issued on C.W.'s personal social media page or on the page of anyone affiliated with SJHS or the District.

39. Less than two hours after posting the comments on Instagram C.W. deleted the posts.

40. At 5:54 a.m., September 30th, 2017, the District requested "extra presence around the schools at arrival and dismissal" from the Montgomery Police, triggered by an alleged event that occurred in another school district.

41. In response to the District's request, John Crowell, Chief of Police of the Montgomery Police Department, commented, "I have not heard anything about this, but we can

---

[2] The second post as written reads: "I'll square up to these stupid coons." C.W. intended to type "clowns" but mistyped the word and his phone autocorrected the mistyped word to be "coons."

have an extra presence. The scary clown trend has been getting pretty popular with the news and I am sure there are some kids taking advantage of it."

42. Following the District's request to the Montgomery Police Department, District Superintendent Frank Forsthoefel sent an email to District principals and other administrators titled "Safety Precaution" in which he alerted the administrators to issues in the Cincinnati area involving the "Clown Craze" in which people dressed as clowns are threatening people, and instances attacking and also posting threats towards schools on social media. He also stated that "[Sycamore schools] have received NO such threats at this time. However, as a precaution we have requested additional police presence around our schools at arrival and dismissal times."

43. At approximately 7:30 a.m. on September 30, 2016, while on the school bus, an 8th grade SJHS student posted on one of the anonymous "scary clown" Twitter pages stating "Come to Sycamore."

44. C.W. arrived at SJHS shortly before 8:00 a.m. on September 30, 2016.

45. At approximately 9:00 a.m., a SJHS student informed SJHS administrators that C.W. (and potentially other Sycamore students) had posted comments on the Clown.Clann Instagram page the day before.

46. Upon information and belief, the SJHS student provided school administrators with a screen shot of C.W.'s comments.

47. At 9:13 a.m. on September 30, 2016, Mallory Bonbright, Sycamore's Chief Public Relations and Communications Officer, emailed District Board Members stating the following: "[The Superintendent] wanted me to alert you to an incident this morning at Sycamore Junior High School. The situation has been handled. At no point was a direct threat made."

48.     Upon information and belief, and in light of the fact that the school was not even aware of C.W.'s post until 9 a.m., Bonbright's email was referring to another incident and the student who made the 7:30 a.m. "tweet."

49.     At approximately 9:55 a.m., between the second and third school periods, the student who made the 7:30 a.m. "Come to Sycamore" tweet was publicly walked down the main hall in handcuffs for all students between classes to see and removed from school by the police. C.W. witnessed the police presence, intervention, and the other student being removed at this time.

50.     At approximately 11:00 a.m., C.W. was taking a test in his fourth period class when he was called to the assistant principal's office.

51.     When he arrived to the main office, C.W. was asked to wait in the lobby and to also help hold the doors open while people were bringing various packages into the office. After five to ten minutes, Assistant Principal Damon Davis brought C.W. into his office where a SJHS teacher, Jason Foley, was also present.

52.     Assistant Principal Damon Davis then confronted C.W. with the screenshot of his posts and began questioning C.W. Upon information and belief, Davis' interrogation of C.W. was performed at the behest of a uniformed police officer who did not enter the room but stayed in the main office lobby nearby during the questioning.

53.     Davis communicated to C.W. that he was being investigated for violations of the school code of conduct for "Harassment, Intimidation, and Bullying" and "Disruption of School."

54.     C.W. admitted that he did make the two Instagram comments and confirmed that he deleted the comments shortly after posting them.

55.     Davis informed C.W. that he might be suspended due to the Instagram comments.

56.     Davis then informed C.W. that the police may want to speak with C.W. either at the police station or in Davis' office.  Davis left the room, leaving C.W. with Foley in Davis' office.

57.     Davis returned approximately three minutes later and provided a pen and piece of paper to C.W. and directed C.W. to write a statement.

58.     At approximately 11:30 a.m. on September 30, 2016, while Davis was in the middle of interrogating and disciplining C.W., the District issued a statement to Sycamore families that stated, in part, "Dear Sycamore Families, This morning, Friday, September 30, the Sycamore Junior High School and Sycamore High School administration teams launched separate investigations into potential threats made on social media. As you may be aware, there has been a recent rash of threats involving people dressed as creepy clowns across the country. In recent days, several local school districts have even cancelled school while investigators determine if the threats are serious. Administrators were alerted to posts involving Sycamore Junior High School students and Sycamore High School students and quickly handled the situation. Montgomery Police is now investigating. At this time we believe these threats are hoaxes connected to the recent social media posts. At no time were students and staff in any danger…We take these threats very seriously. The district will not tolerate a disruption to our educational day. Students engaging in these types of behaviors will face disciplinary and possible legal action. At this time, all weekend events including Aviator Flight Fest will go on as scheduled…"

59.     Upon C.W. completing his statement, Davis took the statement and left the room again for approximately three to five minutes.

60.     Davis then returned to the office and informed C.W. that he was going to be suspended from school for ten days with a recommendation that C.W. be expelled pursuant to the District's policy on Harassment, Intimidation, and Bullying ("HIB") and because C.W. disrupted school.

61.     Davis then attempted to phone C.W.'s parents. At 11:43 a.m., Davis left a voicemail on John Wood's cellphone stating that there had been an incident at school but C.W. was "physically OK" and requested that Mr. Wood call the school.

62.     At approximately 11:52 a.m., Davis was able to reach Catherine Wood on the telephone and took three to five minutes to explain what C.W. had done, that he was being suspended and recommended for expulsion, and that she or C.W.'s father would need to pick up C.W. from the Montgomery police station. Davis did not, however, inform C.W.'s mother that C.W. was going to be arrested. Shortly thereafter, Mrs. Wood informed her husband that C.W. was being taken to the Montgomery City Police station.

63.     After Davis finished explaining to C.W. that he was being suspended and recommended for expulsion, Sergeant Harris of the Montgomery City Police entered the room. Sgt. Harris told C.W. that he was being placed under arrest for "Inducing Panic." Sgt. Harris did not have a warrant for the arrest of C.W. Sgt. Harris did not have probable cause to arrest C.W. for "Inducing Panic." He turned a "blind eye" toward potentially exculpatory evidence. He did the preordained bidding of the school district and its officials. Sgt. Harris did not have credible facts upon which to conclude that C.W. had induced panic within the meaning of state law.

64.     Sgt. Harris instructed C.W. to place his hands on his head, and then, for no legitimate reason, unlawfully proceeded to frisk and search C.W. C.W. had not been accused of

a crime of violence. C.W. did not resist arrest. C.W. was a typical 12-year-old student in school at the time of the unlawful search of his body.

65. C.W. fully cooperated with Sgt. Harris throughout the process despite the fact that he was terrified, in shock, emotionally broken down and sobbing.

66. All of the Defendants knew that Ohio policy and law prohibits the use of mechanical restraints against minor students in school under the circumstances presented.

67. Nevertheless, Sgt. Harris then handcuffed C.W. and walked him through the school lobby in full view of his classmates and other individuals who were in the main office lobby and hall at that time.

68. C.W. was placed in the back of Sgt. Harris' patrol car and asked some administrative questions. This was also the first time the police directly asked for any information from C.W. C.W. was transferred to the Montgomery City Police station at approximately 12:15 p.m. Sgt. Harris removed the handcuffs when C.W. was seated at the police station. C.W. was never offered the opportunity to make a call. No one from the police contacted C.W.'s father or mother to inform them that C.W. had been arrested.

69. The aforementioned detention, interrogation and search of C.W. by Davis and Harris violated the Board's policies JFG and JFG-P "Interrogations and Searches" which provides, in relevant part:

> a. "Interrogations of students by law enforcement agencies and other authorities outside the District are extremely disruptive to a student's educational process; additionally, such interrogations may impact student and/or parental rights. As such the District will attempt to minimize the use of this practice of school grounds and/or during the school day."

b. "A law enforcement agency is required to produce a warrant prior to conducting any search of a student's personal property kept on school premises; however, when the police have reason to believe that any item which might pose an immediate threat to the safety or security of others is kept in a student locker, desk, or other storage space, searched may be conducted without a previously issued warrant."

c. "The questioning of students by law enforcement agencies is limited to situations where parental consent has been obtained or the school official has made an independent determination that reasonable grounds exist for conducting an interrogation during school hours."

d. "Whenever possible, police officers should contact and/or question students off school premises. When it is absolutely necessary for an officer to make a school contact with a student, the school authorities will bring the student to a private room and the contact will be made out of the sight of others as much as possible."

e. "If possible, a parent or legal guardian of the student to be interviewed should be notified by the police or a school administrator before the student is questioned so that the parents may be present if they so desire."

f. "When the police feel it is necessary to remove a child from school, the police should first obtain parental consent or produce a warrant, court order or other legal document that would give them authority to remove the child without parental consent. If the circumstances make it impossible for the police to make this notification to the parents, the principal or designee should do so."

70.     Mr. Wood arrived at the Montgomery Police station at approximately 12:30 p.m. and briefly spoke with Sgt. Harris before taking C.W. home. Sgt. Harris told Mr. Wood that C.W. would need to go to Mayor's Court and likely have to perform some sort of community service such as washing city firetrucks in order to have the charges dropped.

71.     Later that afternoon, after Mr. Wood had an opportunity to speak with his son, he called Sgt. Harris to gather more information about what had occurred. Sgt. Harris told Mr. Wood that he could have processed C.W. at school and released C.W. to Mr. Wood at school (which presumably would have avoided the embarrassment of C.W. being paraded through the school halls in handcuffs) but Sgt. Harris added that the school district "wanted us to arrest them."

72.     C.W. did not disrupt school.  He did not harass, intimidate, or bully anybody, either in general or associated with the school district in particular.  Whatever minor disruption, if any, occurred at C.W.'s school was solely attributable to the Defendants' own mischaracterizations and misconduct.  The Sycamore Superintendent falsely instructed his Board of Education that C.W.'s short-term passive Instagram post the night before on September 29, 2016, had contributed to "upheaval" and also "some panic among our students" the next day on September 30, 2016.

73.     The District's HIB policy states, in part, that: "For purposes of this policy, the term "harassment, intimidation or bullying" means any unprovoked and intentional written, verbal, electronics or physical act that a student has exhibited toward another particular student more than once and the behavior both: (1) causes mental or physical harm to the other student; and (2) is sufficiently severe, persistent or pervasive that it creates an intimidating, threating or abusive educational environment of the other student."

74. The Defendants knew that C.W.'s Instagram comments did not meet the definition of HIB because: (1) C.W. was provoked by the Clown.Clann posts; (2) C.W. did not make a statement towards a "particular student"; (3) C.W. did not make the statements "more than once"; (4) no Sycamore student was harmed by C.W.'s comments; and (5) C.W.'s comments were not "sufficiently severe, persistent or pervasive" so as to create an "intimidating, threatening or abusive educational environment of the other student."

75. Nevertheless, Davis decided to make an example of C.W. by disciplining him for actions that unequivocally did not fall within the District's HIB policy.

76. Upon information and belief, the school district Defendants acted at the behest of the City of Montgomery law enforcement Defendants and vice versa.

77. None of the Defendants provided C.W. with his Miranda Rights at any time.

78. According to the police report, Sgt. Harris charged C.W. with violating O.R.C. § 2927.31, Inducing Panic. The police report states, "Subject was commenting on a Instagram post to ClownClan and stated 'dumb fuck come to Sycamore 'cause you know you wont! Other Sycamore Jr. High students were able to view and read the post from [C.W.], thus creating a panic for the students @ Sycamore Jr. HS."

79. On September 30, 2016, at 4:27 p.m., Superintendent Forsthoefel emailed an update to his administrators stating, in part, that: "We had a total of 5 students post on social media about the clowns. They did not express explicit threats but invited the clowns to our district."

80. C.W. attempted to challenge the suspension and expulsion. Based on the recommendation of the expulsion committee Forsthoefel decided that C.W. would be suspended from school for five days, that C.W. was not expelled, and that the expulsion would be held in

abeyance. Forsthoefel stated that, "The recommendation for expulsion was a result of [C.W.] violating the Threat/Inducing Panic policy as stated in the Sycamore School District Code of Conduct. Because we recognize the importance of education in the lives of our students, excluding students from school is a last resort. However, we cannot tolerate misbehavior of the sort that [C.W.] has demonstrated."

81.     The Defendants initially referred C.W. to the City of Montgomery Unofficial Juvenile Court.  However, despite being pressured to "admit" to an offense he did not commit and agree to perform community service as a punishment, C.W. continued to deny the charges against him.

82.     On November 29, 2016, (approximately two months after the alleged crime and one month following C.W.'s plea of not-guilty in Montgomery Mayor's Court) Sgt. Harris signed a Hamilton County Juvenile Court Complaint under oath, testifying to the following:

> "[C.W.] did cause serious public inconvenience by circulating a report/warning of
>
> an alleged/ impending crime knowing such report/warning was false, contrary to
>
> and in violation of Section 2917.31 of the Ohio Revised Code, a Misdemeanor of
>
> the First Degree."

The Defendants did not file the Complaint with the Hamilton County Juvenile Court until January 3, 2017.

83.     As a result of this Complaint, the Hamilton County Juvenile Court started delinquency proceedings against C.W. in Case Number 17-42 Z for the alleged crime of Inducing Panic, R.C. § 2917.31.

84.     Within the State of Ohio Juvenile Delinquency Proceedings, C.W. denied the charges in writing on January 13, 2017, and filed a Motion to Dismiss the charge of Inducing Panic on or about February 28, 2017.

85.     Upon information and belief, knowing that the criminal charge of Inducing Panic should be dismissed, the Hamilton County Juvenile Prosecutor instructed Sgt. Harris to bring new charges against C.W. so that the case against C.W. would continue.

86.     Thus, on April 12, 2017, Sgt. Harris signed three new complaints against C.W. under oath, testifying to the following:

"[C.W.] did make a telecommunication to CLOWN CLAN INSTAGRAM, with purpose to harass another person, contrary to and in violation of Section 2917.21 (B)&(C) of the Ohio Revised Code, a misdemeanor of the first degree."

"[C.W.] DID KNOWINGLY POST A TEXT ON AN INTERNET WEB SITE HARASSING CLOWN CLAN INSTAGRAM, contrary to and in violation of Section 2917.21 B(2) of the Ohio Revised Code misdemeanor of the first degree."

"[C.W.] DID CAUSE PUBLIC ALARM THROUGH A TWITTER FEED BY POSTING ON CLOWN CLAN INSTAGRAM TO COME TO SYCAMORE JR. HIGH SCHOOL FOR FLIGHT FEST, contrary to and in violation of Section 2917.31 (A3) of the Ohio Revised Code misdemeanor of the first degree."

87.     The above statements issued by Sgt. Harris under oath are patently false in several respects, including without limitation:

(i) Sgt. Harris did not believe that C.W. intended to harass "another person";

(ii) Sgt. Harris knew C.W. did not at any point use a "Twitter Feed" to make any comments;

(iii) Sgt. Harris knew that C.W. never instructed anyone to "come to Sycamore Jr High School for Flight Fest."

88. On April 17, 2017, the Prosecutor finally dismissed the false charge against C.W. of inducing panic in Case No. 17-42Z but then orally amended the three newly filed charges in Cases 17-2468Z, 17-2469Z, and 17-2470Z. The "amendments" by the Prosecutor made the original charges in the sworn Complaint against C.W. unrecognizable.

89. C.W.'s short-term comments on Instagram did not make any overt or direct threat to the Sycamore Community School District, its students, or its staff. There was no evacuation or "lock-down" let alone any significant evidence of "disruption." Upon information and belief, the City of Montgomery Police Department has not made any effort to close down the various "scary clown" sites or arrest the individuals maintaining those sites.

## FIRST CAUSE OF ACTION

### *Denial of C.W.'s First Amendment Right to Free Speech*
### (All Defendants)

90. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint

91. C.W., like all United States citizens, has a First Amendment constitutional right to free speech.

92. C.W.'s thirteen-words, shorter than two-hour social media posting on September 29, 2016, from his own home, on his own time, using his own phone, unrelated to any school-sponsored event was fully protected by the First Amendment's right to free speech.

93. All of the Defendants' conduct in seizing, disciplining, arresting, and prosecuting C.W. in response to C.W.'s fully protected First Amendment speech violated C.W.'s constitutional rights and proximately caused him, and still continues to cause, significant injury.

## SECOND CAUSE OF ACTION

### Denial of C.W.'s Fourth Amendment Right to be Free from Unreasonable Seizures and Unlawful Arrest
**(Defendants School Board, Forsthoefel, Davis, Harris, and City of Montgomery)**

94. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint

95. C.W., like all United States citizens, has a Fourth Amendment constitutional right to be free from unreasonable seizures.

96. Davis deprived C.W. of his constitutional right to be free from unreasonable seizure by physically detaining C.W. in his office while Sgt. Harris stood just outside of the office.

97. Sgt. Harris deprived C.W. of his constitutional right to be free from unreasonable seizure by physically restraining C.W. in handcuffs and placing him under arrest despite lacking any probable cause to do so.

98. Defendant Superintendent Forsthoefel instructed the Board of Education and ratified the Defendants' unlawful conduct.

99. As a direct and proximate result of the Defendants' violation of C.W.'s constitutional rights, C.W. has suffered damages.

## THIRD CAUSE OF ACTION

### Denial of C.W.'s Fourth Amendment Right to be Free from Unreasonable Searches
**(Defendants Harris and the City of Montgomery)**

100. Plaintiffs incorporate the preceding paragraphs of this Complaint.

101. C.W., like all United States citizens, has a Fourth Amendment constitutional right to be free from unreasonable searches.

102. Sgt. Harris deprived C.W. of his constitutional right to be free from unreasonable searches by physically frisking C.W. in Davis' office despite lacking any reasonable suspicion and/or probable cause to do so.

103. As a direct and proximate result of Defendants' violation of C.W.'s constitutional rights, C.W. has suffered damages.

## FOURTH CAUSE OF ACTION

### Denial of C.W.'s Fourth Amendment Right to be Free from Excessive Force
### (Defendants Harris and City of Montgomery)

104. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

105. C.W., like all United States citizens, has a constitutional right to be free from the use of excessive force.

106. Sgt. Harris deprived C.W. of his constitutional right to be free from the use of excessive force by handcuffing C.W., a minor child arrested in school without probable cause for an alleged nonviolent offense, without any lawful basis to do so.

107. As a direct and proximate result of the violation of C.W.'s constitutional rights, C.W. has suffered damages.

## FIFTH CAUSE OF ACTION

### Fifth Amendment Right to Miranda Warning
### (Defendants School Board, Davis, Harris and City of Montgomery)

108. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

109. The Defendants did not provide C.W. his Fifth Amendment right to a Miranda warning.

110.   As a direct and proximate result of the violation of C.W.'s constitutional rights, C.W. has suffered damages.

## SIXTH CAUSE OF ACTION

### *Intentional Infliction of Emotional Distress*
**(Defendants School Board, Forsthoefel, Harris, Davis, City of Montgomery)**

111.   Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

112.   The foregoing actions and omissions of the Defendants towards the Plaintiffs were outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.

113.   The foregoing actions and omissions of the Defendants towards the Plaintiffs were intentional or reckless.

114.   The foregoing actions and omissions of the Defendants towards the Plaintiffs caused Plaintiffs to suffer severe emotional distress.

115.   As a direct and proximate cause of the foregoing actions and omissions of the Defendants towards the Plaintiffs, Plaintiffs have suffered damages.

## SEVENTH CAUSE OF ACTION

### *Unconstitutional Customs, Policies, and Procedures*
**(City of Montgomery)**

116.   Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

117.   Upon information and belief, the City of Montgomery has a policy and practice of neglecting the civil rights of juveniles.

118.   Such policy and practice is evidenced by the Defendants' failure to give Miranda warnings, unconstitutional search, seizure, excessive force, and arrest of C.W.

119.    Upon information and belief, Sgt. Harris acted pursuant to the City of Montgomery's customs, policies, and procedures when he deprived C.W. of his constitutional rights.

120.    As a direct result of the actions and conduct of the City of Montgomery, C.W. has suffered a deprivation of his constitutional rights and damages.

## EIGHTH CAUSE OF ACTION

### *Unconstitutional Customs, Policies and Procedures*
### (School Board)

121.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

122.    Upon information and belief, Defendants Davis and Forsthoefel acted pursuant to the District's customs, polices, and procedures when they deprived C.W. of his constitutional rights.

123.    As a direct result of the actions and conduct of the Board, C.W. has suffered a deprivation and his constitutional rights and damages.

## NINTH CAUSE OF ACTION

### *Unconstitutional Acts of Final Policymakers*
### (School Board)

124.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

125.    Upon information and belief, Defendant Forsthoefel was delegated with policymaking authority by the Board with respect to the manner in which District employees disciplined students for speech protected by the First Amendment; neglected students' Fourth Amendment rights to be free from unreasonable searches, seizures, and excessive force; and coercing statements in conjunction with police department officials in violation of Fifth Amendment Miranda rights.

126.     Upon information and belief, there is a custom within the District of allowing its Superintendent to make final policy decision with respect to the day-to-day conduct of employees including the handling of disciplinary investigations.

127.     The District's final policymakers ratified the unconstitutional conduct of District employees described above.

128.     C.W.'s constitutional and other rights were violated as a direct and proximate cause of such ratification and C.W. has suffered significant damages.

### TENTH CAUSE OF ACTION

*Declaring Ohio Revised Code § 2917.21 (B)(1) and (B)(2) Unconstitutional and*
*Enjoining Enforcement of the Same*
**(Mike DeWine, Ohio Attorney General and**
**Joseph T. Deters, Prosecuting Attorney for Hamilton County, Ohio)**

129.     Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

130.     Ohio Revised Code § 2917.21(B)(2) provides, in relevant part: "No person shall knowingly post a text or audio statement or an image on an internet web site or web page for the purpose of abusing, threatening or harassing another person."

131.     Ohio Revised Code § 2917.21(B)(1) provides, in relevant part: "No person shall make or cause to be made a telecommunication, or permit a telecommunication to be made from a telecommunications device under the person's control, with purpose to abuse, threaten, or harass another person."

132.     The above statutes purport to criminalize constitutionally protected speech and expression on the internet.

133.     Pursuant to Ohio Revised Code § 2917.21(C)(2), violation of the statute is a misdemeanor of the first degree upon a first offense, and a felony of the fifth degree upon any subsequent offense.

134.    C.W. is currently being prosecuted for "harassing" telecommunications under this statute by the Prosecuting Attorney for Hamilton County, Ohio.

135.    On its face, Section 2917.21(B)(2) criminalizes expression based upon the content of the expression in question.

136.    On its face, Section 2917.21(B)(2) criminalizes expression based upon the purpose of the expression in question, making it an offense to publish material online "for the purpose of abusing, threatening, or harassing another person." Under this statute, any online expression published with the intent to abuse or harass another person is proscribed and subject to prosecution, making the restriction content based.

137.    Plaintiffs do not object to preserving that portion of the quoted subsection which prohibits posting online for the purposes of threatening another person, but sue to contest that portion which forbids posting online for the purpose of abusing or harassing another person.

138.    As a content-based restriction on speech, Section 2917.21(B)(2) is "presumptively unconstitutional" unless it both furthers a compelling governmental interest and is narrowly tailored to do so. Section 2917.21(B)(2) serves no compelling governmental interest, nor is it narrowly tailored to serve any legitimate state interest.

139.    Section 2917.21(B)(2) restricts substantially more protected speech than is necessary to serve any legitimate governmental interest, much less any compelling governmental interest, and the Plaintiffs are accordingly entitled to a declaration that the contested statute violates the First Amendment to the United States Constitution, as incorporated against the states by the Fourteenth Amendment.

140. Additionally, Plaintiffs are entitled to a preliminary and permanent injunction enjoining the Ohio Attorney General and the Prosecuting Attorney for Hamilton County, Ohio from enforcing the contested statute against C.W.

## ELEVENTH CAUSE OF ACTION

### *Loss of Consortium*
**(All Defendants)**

141. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

142. As a direct and proximate result of the conduct of the Defendants, John and Catherine Wood as the parents of C.W. have been damaged due to the deprivation of the services, society, companionship, comfort, love, solace and affection of their child and are entitled to recover for their loss of consortium in an amount to be determined at trial.

**WHEREFORE,** Plaintiffs pray that judgment be entered in their favor against the Defendants and that the Court award:

John and Cathy Wood, individually and on behalf of their minor child C.W. compensatory damages in an amount to be determined at trial, including, but not limited to, damages for emotional distress and loss of reputation, together with punitive damages, a preliminary and permanent injunction barring the Hamilton County, Ohio Prosecutor from continuing to prosecute claims against C.W., and an award of reasonable costs and attorney fees, together with such other relief to which Plaintiffs may be entitled in law or in equity.

Respectfully Submitted,


/s/Bradley M. Gibson_____
Bradley M. Gibson, Esq. (0087109)
FINNEY LAW FIRM, LLC
4270 Ivy Pointe Boulevard, Ste. 225
Cincinnati, OH 45245
(513) 943-6661
(513) 9413-6669 (fax)
Brad@FinneyLawFirm.com

and

/s/Richard Ganulin
Richard Ganulin, Esq. (0025642)
3662 Kendall Avenue
Cincinnati, OH 45208
(513) 405-6696
rganulin@gmail.com

*Attorneys for Plaintiffs*